# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1139
_____

United States of America

*Plaintiff - Appellee*

v.

Wesley L. Yellow Horse, Sr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: October 10, 2014
Filed: December 22, 2014

_____

Before COLLOTON, BRIGHT, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Wesley Yellow Horse was convicted of conspiracy to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. At sentencing, the district court[1] determined Yellow Horse could have

_____

[1]The Honorable Jeffrey L. Viken, Chief Judge, United States District Court for the District of South Dakota.

reasonably foreseen the conspiracy involved 100 kilograms or more of marijuana and calculated his Guidelines range accordingly, imposing a sentence of 57 months imprisonment. Yellow Horse argues the district court erred in finding he could have reasonably foreseen the conspiracy involved that much marijuana. Because we find no clear error in the district court's drug quantity determination, we affirm.

## I.  Background

In an August 2013 superseding indictment, a grand jury charged Yellow Horse with conspiracy to distribute 50 kilograms or more of marijuana. The indictment alleged the conspiracy was carried out between October 2008 and May 2012. At trial, the government introduced evidence about Yellow Horse's role in the conspiracy and the conspiracy's overall scope. Abraham Romero led the conspiracy, which started distributing drugs on the Pine Ridge Indian Reservation in South Dakota in 2008. Yellow Horse purchased marijuana directly from Romero from spring 2009 to winter 2009, receiving quarter- to one-pound quantities at a time. Yellow Horse repackaged and sold the marijuana in personal use quantities or fronted it to others for resale, including two occasions where he fronted quarter-pound quantities to a co-conspirator, Jimmy Bravo. After Yellow Horse sold his first pound of marijuana, Romero offered to front him four pounds at once, but Yellow Horse refused because he had difficulty moving the first pound. He also refused Romero's request that he sell cocaine.

In summer 2009, Yellow Horse drove Romero to a Safeway in Nebraska to buy supplies to mix with cocaine to make it into larger quantities for resale. In fall 2009, Yellow Horse saw Romero with four large, circular metal objects filled with marijuana. Yellow Horse witnessed Romero open the objects with a saw to remove the marijuana. Throughout the course of their relationship, Yellow Horse had difficulty moving his marijuana as quickly as Romero wanted and repaying Romero for marijuana Romero had fronted him. Yellow Horse twice gave Romero vehicles

to clear his debts. On the first occasion, Yellow Horse brought Bravo with him and introduced him to Romero. Bravo later started selling drugs for Romero. On the second occasion, in winter 2009, Romero gave Yellow Horse a pound of marijuana, accepted a vehicle in satisfaction of Yellow Horse's debt, and told Yellow Horse to stay away from Romero's house for a while. Romero estimated he sold Yellow Horse a total of approximately three pounds of marijuana in 2009.

Yellow Horse continued selling marijuana after his relationship with Romero ended, purchasing from a number of individuals, including at least one person he knew was buying from Romero. Yellow Horse also knew that Bravo and another co-conspirator, Norton Little Spotted Horse, were selling drugs for Romero after 2009. Yellow Horse had purchased marijuana from Little Spotted Horse before meeting Romero. Multiple witnesses testified that Yellow Horse sold personal use quantities of marijuana out of his home for several years. Bravo estimated he had seen Yellow Horse with as much as 3 pounds of marijuana at one time and as much as 160 pounds over the years in question.

The jury found Yellow Horse guilty of conspiracy to distribute less than 50 kilograms of marijuana. The Presentence Report (PSR) recommended holding Yellow Horse accountable for at least 100 kilograms but less than 400 kilograms of marijuana based on witness testimony and co-conspirator statements that Yellow Horse distributed marijuana in the conspiracy from March 2009 to May 2012 and that more than 100 kilograms were distributed through the conspiracy during that time frame. At sentencing, the government argued Yellow Horse could have reasonably foreseen at least 113 kilograms, or 250 pounds, of marijuana, which it calculated by adding 51 pounds it seized in 2011 to the more than 200 pounds of marijuana Romero testified he otherwise distributed during the conspiracy. The district court considered Yellow Horse's objections to the PSR and found by a preponderance of the evidence that Yellow Horse could have reasonably foreseen that the conspiracy involved at least 100 kilograms of marijuana. The base offense level for this crime was 26 under

the version of the Guidelines in place when Yellow Horse was sentenced. United States Sentencing Commission, Guidelines Manual, § 2D1.1(c)(7) (Nov. 2013). The court applied a two-level minor participant reduction, pursuant to USSG § 3B1.2(b), calculating a total base offense level of 24. The PSR placed Yellow Horse in criminal history category II based on his criminal history score of 3, resulting in a Guidelines range of 57 to 71 months imprisonment. The court sentenced Yellow Horse to 57 months imprisonment with 3 years supervised release. Yellow Horse now challenges his sentence, arguing the district court erred in its drug quantity determination.

## II. Discussion

"'Our review of a district court's drug quantity determination is for clear error, applying the preponderance-of-the-evidence standard, even if the evidence of quantity were insufficient for purposes of a jury's quantity calculation.'" United States v. Rodriguez, 711 F.3d 928, 938 (8th Cir.) (quoting United States v. Turner, 603 F.3d 468, 471 (8th Cir. 2010)), cert. denied, 134 S. Ct. 715 (2013). "[A] district court may impose a sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence." United States v. Webb, 545 F.3d 673, 677 (8th Cir. 2008). The maximum sentence for Yellow Horse's conviction for conspiracy involving less than 50 kilograms of marijuana was 60 months imprisonment. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). The court's 57-month sentence did not exceed the 60-month statutory maximum, so the only question we must resolve is whether the district court clearly erred in finding by a preponderance of the evidence that Yellow Horse could have reasonably foreseen the conspiracy involved 100 kilograms or more of marijuana.

Yellow Horse argues that, as only a minor participant in the conspiracy, he could not have reasonably foreseen that the conspiracy involved this much marijuana. Yellow Horse concedes his co-conspirators' statements support a finding that the

conspiracy overall involved more than 100 kilograms, but contends the government failed to prove his knowledge of the conspiracy's scope. In support of this claim, he argues that he only sold small amounts of marijuana for a short period of time; that Romero was secretive about his operations and did not tell co-conspirators about the operation's scope or keep any records Yellow Horse could have viewed; that Yellow Horse never identified specific quantities of drugs he saw or thought the conspiracy involved; and that none of the witnesses testified directly about Yellow Horse's knowledge of the overall quantities the conspiracy was distributing. Thus he argues that, even assuming the credibility of the government's witnesses, the evidence was insufficient to support the district court's drug quantity determination.

"'When calculating drug quantity in the context of a narcotics trafficking conspiracy, the sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy.'" United States v. Whirlwind Soldier, 499 F.3d 862, 872 (8th Cir. 2007) (quoting United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006)); see also United States v. Walker, 688 F.3d 416, 421 (8th Cir.) ("In a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." (citation omitted)), cert. denied, 133 S. Ct. 801 (2012). For sentencing purposes, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." USSG § 2D1.1, comment. (n.5); see also United States v. Sicaros-Quintero, 557 F.3d 579, 582 (8th Cir. 2009).

The court found Yellow Horse conspired with Romero, who testified the conspiracy involved more than 100 kilograms, and with Bravo and Little Spotted Horse, who both entered plea agreements supported by factual statements that the conspiracy involved more than 100 kilograms. See United States v. Atkins, 250 F.3d 1203, 1213 (8th Cir. 2001) ("[T]he testimony of co-conspirators is sufficient evidence

-5-

on which the court may base the quantity of drugs used for sentencing."). Yellow Horse was not held responsible for marijuana distributed by the conspiracy before he joined in spring 2009 and argues he should not be held responsible for amounts distributed after he broke ties with Romero in winter 2009. But "a member of a drug conspiracy is responsible for all reasonably foreseeable actions of a conspiracy unless he withdraws from the conspiracy . . . [and] a souring of a relationship between a defendant and his coconspirators resulting in an end of the defendant's business relationship with the conspiracy is insufficient to establish a withdrawal from the conspiracy." United States v. Rodriguez-Ramos, 663 F.3d 356, 363 (8th Cir. 2011), cert. denied, 132 S. Ct. 1938 (2012). Yellow Horse does not advance an argument that he took the kind of affirmative action required to effectively withdraw from the conspiracy. See United States v. Spotted Elk, 548 F.3d 641, 676 (8th Cir. 2008).

Given evidence of Yellow Horse's knowledge of the drug business generally and Romero's operations specifically, his argument that his minor role and Romero's secretiveness kept him from understanding the conspiracy's scope is unpersuasive. Yellow Horse knew a number of actors were involved in the conspiracy, understood that Romero distributed sizable amounts of marijuana and other drugs, and personally witnessed Romero handling large quantities of marijuana. After Yellow Horse and Romero stopped dealing directly with each other, Yellow Horse continued selling marijuana he purchased from a number of individuals, including at least one individual he knew was buying from Romero, and he knew that his co-conspirators continued selling drugs for Romero.

Finally, evidence of specific drug quantities is not required, as the "[t]he court may make a specific numeric determination of quantity based on imprecise evidence so long as the record reflects a basis for the court's decision." United States v. Roach, 164 F.3d 403, 413-14 (8th Cir. 1998) (citation omitted). The court's finding in this case was supported by evidence on the record and squarely within the range that evidence suggested. See United States v. Alexander, 408 F.3d 1003, 1010 (8th

Cir. 2005) ("This is not a case where paraphernalia and other evidence suggest a certain quantity range and a sentencing court finds a quantity disproportionate to what the evidence suggests."). Given this evidence, we find no clear error in the district court's determination that Yellow Horse could have reasonably foreseen the conspiracy involved 100 kilograms or more of marijuana.

## III. Conclusion

Because we do not find clear error in the district court's drug quantity determination, we affirm Yellow Horse's sentence.

_____